UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: _____

<u>JURY TRIAL DEMANDED</u>

CHRISTOPHER T. BERES

and

JOHN DOES,

                Plaintiffs,

vs.

DAILY JOURNAL CORPORATION,

                Defendant.
_____/

<u>COMPLAINT</u>

Plaintiffs, CHRISTOPHER T. BERES, an attorney admitted in the State of Florida and in this Court, and JOHN DOES, sue DAILY JOURNAL CORPORATION and state as follows.

<u>JURISDICTION AND VENUE</u>

1.      Jurisdiction for this cause of action lies within this court by virtue of 28 U.S.C. 1332.  This is an action for defamation and the parties are diverse in citizenship.

2.      Plaintiff, CHRISTOPHER T. BERES (together with JOHN DOES, "Beres"), is a citizen and resident of the State of Florida having an address at 16975 NE 35th Ave, North Miami Beach, Florida 33160.

3. DAILY JOURNAL CORPORATION ("DJC") is a public corporation based and operating in the State of South Carolina and is therefore diverse in citizenship to Beres by virtue of 28 U.S.C. 1332(c)(1). DJC is the publisher of The Daily Journal.

4. The amount of damages sought in this cause of action is $20,000,000 in compensatory damages and $100,000,000 in punitive damages, thus meeting the subject matter jurisdiction requirements of 28 U.S.C. 1332(a) because the matter in controversy exceeds the sum or value of $75,000.

5. Venue is proper in the Southern District of Florida for the following reasons:

a) The tort which is the basis of this lawsuit was committed in South Florida in addition to all over the world. South Florida has a population of approximately 10 million people, thus making the alleged defamatory statements in this venue significant.

b) Beres is a citizen of the State of Florida and resides in South Florida.

c) Venue is further proper because defendant has and/or continues to regularly conduct business in Florida.

6. Defendant is liable to personal jurisdiction under Florida's long-arm statute Fla. Stat. § 48.193 (2017) because it defamed Beres in the State of Florida. Several persons in the State of Florida, including members of the Florida Bar, accessed the articles in *The Daily Journal* in the State of Florida. Exhibit A. The material was accessed-thus-published in Florida. Defendant has transacted business and engaged in tortious conduct, by affirmative act or omission, in the State of Florida such that it reasonably anticipated being subject to personal jurisdiction before the courts of

this State.  Defendant has also transacted business and engaged in tortious conduct, by affirmative

act or omission, outside of the State of Florida whereby it reasonably anticipated that injury would

result and has, in fact, resulted upon persons within the State of Florida.  As such, this Court has

personal jurisdiction over defendant pursuant to Fla. Stat. §§ 48.193(1)(a)(2) and 48.193(1)(a)(6).

7.      This Court has jurisdiction pursuant to the provisions of Chapter 501, Part II,

Florida Statutes.   The acts or practices alleged herein occurred in the conduct of "trade or

commerce" as defined in Section 501.203(8), Florida Statutes.

8.      The statutory violations alleged herein occurred in or affect more than one judicial

district in the State of Florida, including the Southern District of Florida.

<u>Statement of the Case</u>

9.      This is an action for damages arising from The Daily Journal's publication of two

articles containing false, injurious, and defamatory statements about Beres and others.

10.     The articles contain false and malicious statements attributing conduct and

characteristics to plaintiffs that are contrary to the profession of an attorney.

11.     The defendant's false and malicious statements include, without limitation, a) that

plaintiffs are unscrupulous lawyers, b) that plaintiffs committed, were sued for, and were accused

of crimes and had a criminal mental state, and c) that plaintiffs stole and sold *trade secrets*.

12.     The defendant's false and  malicious statements, when considered alone and

without innuendo, have a) negatively impacted plaintiffs' trustworthiness and character, b) caused

plaintiffs to be subject to distrust, ridicule, contempt, and disgrace, and c) injured plaintiffs' reputation and goodwill.

13.    As a result of defendant's actions, plaintiffs have suffered damages for which the defendant should compensate plaintiffs.

14.    Plaintiffs have performed all conditions precedent to the bringing of this action.

<u>COUNT ONE</u> –
DEFAMATION (SLANDER AND LIBEL)

15.    Prior to the filing of this lawsuit, Dennis Fairbanks, Esq., Barbara Jimmis, Maria Morton, Devale Rivers, Jr., Kaori Suzuki Fischer, and Anthony Trombetta, all Florida citizens and residents, accessed the articles in the State of Florida, opened them, and read them.  Mr. Fairbanks is a member of the Florida Bar.  They said that the articles defamed Beres and others.

16.    Beres is a member in good standing of the Florida Bar for almost 20 years.  He graduated from Capital University Law School in 1992 and also received his master's degree in East Asian Studies from the University of Pennsylvania.    Beres has a long and distinguished career as a public defender and criminal defense attorney in this State.  He is a professional of high repute.

17.    On March 30, 2020, one of Beres's clients was terminated by Toyota Motor Corporation and Toyota Motor North America, Inc. (collectively "Toyota"), its law firm, Wilmer, Cutler, Pickering, Hale, and Dorr LLP ("Wilmer Hale"), and their job agency HC2, Inc. ("HC2")

from employment as a Thai language translator in illegal retaliation for his public health and safety

complaint against them during the height of the coronavirus pandemic.  On April 15, 2020, Beres

sued Toyota and Akio Toyoda on behalf of his client in the courts of Florida.  *John Doe v. Toyota*

*Motor Corp. et al.,* No. 05-2020-CA-024281 (Fla. 18th Cir. Ct. April 15, 2020).   On April 22,

2020, in order to preempt his lawsuit, HC2 sued Beres's client in the United States District Court

for the Southern District of New York (the "Southern District") seeking an ex parte temporary

restraining order ("TRO") and a preliminary injunction ("PI") and asserting two claims for 1)

breach of contract and 2) faithless servant doctrine.   *HC2, Inc. v. Delaney*, 1:20-cv-03178

(S.D.N.Y. filed April 22, 2020) (Liman, J.).  Those were the only two claims and were *civil* claims.

*Significantly, the plaintiff in that case, HC2, never accused Beres or his client of stealing or selling*

*trade secrets - the whole subject of DJC's articles.*   On April 22, 2020, the Honorable Lewis J.

Liman denied HC2's ex parte TRO motion.  On May 27, 2020, Judge Liman also denied HC2's

application for a PI.

18.     In rejecting the PI, Judge Liman issued an order referencing "Delaney's lawyer"

(Beres) and ruled that Beres's April 7, 2020 employment demand letter to Akio Toyoda, Chairman

of Toyota Motor Corporation, was "a routine demand letter" and "it's not an extortion".  The

federal judge held that Beres was merely exercising his and his client's rights under the law:

> "Delaney's lawyer makes the allegation that plaintiff violated Delaney's rights and then
> states 'I hereby grant you seven days from the date of this letter to contact me with your
> offer to settle this case. If you fail to contact me by this date, I will commence legal action
> against you without further notice.' The evidence is that letter was only given to the
> plaintiff in this case shortly before the state court complaint was filed and not with the full

seven days. <u>Even then it is a routine demand letter and it's not an extortion</u>. *See U.S. v. Jackson*, 180 F.3d 55, 61, that a claim of right is not an extortion."

(emphasis added)   Judge Liman further held that the information in the case was of no value to anyone and *were not trade secrets.*

> "Number two, there has been no showing that any information Delaney has is of any commercial value to any third party or that there would be any benefit to Delaney from disclosing that information. The only value that the information apparently has -- at least in Delaney's mind -- is as evidence in support of his claim against HC2."

19.     Judge Liman read the Southern District order out loud in open court at a public hearing at which reporters attended and were invited to attend.

20.     On April 28-29, 2020, *only six and seven days respectively after the Southern District case was filed*, DJC's The Daily Journal published a two-part article over two days referring to Beres, his client, and the Southern District case.   Due to the public nature of the docket and the widespread coverage of the Florida and Southern District cases, where Beres is repeatedly mentioned as the John Doe attorney and the employment attorney who issued the Toyota demand letter, it is clear that the references are to him.

21.     According to DJC's 10-K filed with the United States Securities and Exchange Commission, "The Daily Journal" consists of The Los Angeles Daily Journal and The San Francisco Daily Journal.[1]   There are over 270,000 members of the California Bar.   According to the State Bar of California official website, 976 California lawyers are located in Florida with 160 in Miami alone.

---

[1]

https://yahoo.brand.edgar-online.com/efxapi/EFX_dll/EDGARpro.dll?FetchFilingHtmlSection1?SectionID=10433114-8291-61524&SessionID=NY4MeSrD8AM9A47

22.     On April 28-29, 2020, DJC published a two-part article "Does COVID-19 threaten your trade secrets? (Yes, it does) (Part 1)" and "Does COVID-19 threaten your trade secrets? (Yes, it does) (Part 2)."    The articles are on their face about theft of trade secrets.   The headlines themselves are defamatory.   The articles are focused on Beres's case and state "Yes, it does" that companies' - in this case Toyota's, Wilmer Hale's, and HC2's - "trade secrets" were threatened. The headlines pose a rhetorical question that includes the "answer".   It is a strawman for, and part and parcel of, DJC's defamation.   In other words, the articles "conclude" that Beres and his client were guilty six days after the case was filed:  "Yes, it does".

23.     Dated April 28, 2020, the DJC article Part 1 contains the following statement:

> Any time there is a termination of an employee, there is potential for misappropriation or loss of trade secrets.  Consider the following potential scenarios:

This is followed by three bullet points.  The third and last bullet point reads:

> •     A terminated employee cannot find new employment and decides to use the former employer's trade secrets as a source of income.  See, e.g., *HC2 Inc. v. Delaney*, Case No. 1:20-cv-03178 (U.S. District Court for the Southern District of New York)(complaint alleges that a former employee of a legal staffing company tried to extort clients for $450,000 by threatening to release confidential information after they suspended a document review project due to the COVID-19 pandemic).

(emphasis added)   Every part of the first sentence is false and defamatory:  1) Beres's client was not "a terminated employee [who] cannot find new employment"[2], 2) Beres's client did not "*decide to use the former employer's trade secrets as a source of income*" (nor would there be any way of

---

[2] When the articles were published, the only document was HC2's complaint dated April 22, 2020.  But the complaint clearly stated that Beres's client was *not terminated* by it:  "HC2 never terminated the Employment Agreement or took any other action to terminate Delaney's employment by HC2."  *HC2*, Docket No. 1, at para 23 p. 6.  DJC even lied as to this basic issue.

DJC's knowing this), and 3) there were no "trade secrets" in this case.  These words were not in the complaint in the Southern District Case or anywhere and were fabricated by DJC.  No one - except for DJC  - ever claimed that Beres's client "cannot find employment" "and decided to use the former employer's trade secrets as a source of income."  The word "decides" purports to know what plaintiffs were thinking and attributes to them a criminal intent and mental state.

24.     The supposed "threat to disclose confidential information" and "extortion" in The Daily Journal is a clear reference to Beres's April 7, 2020 employment demand letter to Toyota Motor Corporation in Japan, thereby imputing these crimes to him.  Exhibit B.

25.     The DJC articles are *about* the Southern District case.  Their whole point is that there was the theft of trade secrets in Beres's case.  In fact, there is only one other case cited in the articles.  "See, e.g., *Covenant Testing Technologies LLC v. Judge*, Case No. 2020-22716 (127th District Court of Harris County, Texas)(complaint alleges that the defendant took revenge for being fired by deleting data files minutes after she was notified of her termination)."

26.     But the federal judge found that there were no "trade secrets" in the case.

27.     The Southern District case is a *civil* case for breach of contract.   But The Daily Journal nevertheless accused Beres and Beres's client of crimes.  There is no civil extortion in New York. It accused them, among other things, of "misappropriation", theft and sale of trade secrets, and extortion.

28.     Worse - and going to DJC's malice and intent - the articles *deliberately do no not include a date in the citation to the Southern District case*.  The citation reads:  "See, e.g., *HC2 Inc. v. Delaney*, Case No. 1:20-cv-03178 (U.S. District Court for the Southern District of New

York)."  This is obviously not a proper form of citation.  DJC deliberately did not include the date of the case - which was April 22, 2020, only six and seven days before the articles were published - to give the false impression that it was not a case that had just been filed.  Given the timing, it is clear that as soon as the case was filed, DJC decided to write these articles about it.  This was due to its agenda to market legal services for employment lawyers during the coronavirus climate of fear.  But neither in the citation nor anywhere in the articles did DJC mention that the case had just been filed.

29.     Adding to this, DJC never contacted Beres or anyone on his side of the case for his or their side of the story.  This is because DJC and its wealthy law firm customer, advertiser, and multiple account subscriber were trying to sell legal services during the coronavirus climate of fear and did not want to present any information that did not "fit the narrative" i.e. "Does COVID-19 threaten your trade secrets? (Yes, it does)."[3]  This was "asked and answered".

30.     Such conduct is in direct violation of law and outside first amendment protection.

31.     The defamatory content about Beres and his client spread like a disease including on social media.  The DJC articles were posted on Twitter: "LA Daily Journal @LADailyJournal

---

[3] As a side point, these practices by DJC go against journalistic ethics.  In contrast, the Ethics Policy of The Washington Post states inter alia:

> No story is fair if it consciously or unconsciously misleads or even deceives the reader.  Fairness includes honesty - leveling with the reader.

> No story is fair if it covers individuals or organizations that have not been given the opportunity to address assertions or claims about them made by others.  Fairness includes diligently seeking comment and taking that comment genuinely into account.

https://www.washingtonpost.com/policies-and-standards/

Does COVID-19 threaten your trade secrets? (Yes, it does) #COVID-19 is wreaking havoc in a number of legal areas. Full column by Rebecca J. Edelson and Seong H. Kim @SheppardMullin here:  https://dailyjournal.com/articles/35742" with a link.   Exhibit C.

32.     Links are available on Sheppard, Mullin, Richter & Hampton LLP's ("Sheppard Mullin") website press releases page.

33.     These articles slanderously depict Beres and others and impute misconduct to him and them.

34.     The damage to Beres's and his client's reputations does not have to be imagined. The defamation in this case directly affects Beres's and his client's business and profession as lawyers and is therefore defamatory per se.  Defendant caused substantial damage to Beres and others by irreparably harming his and their reputation and business.   No client would ever hire a lawyer who is accused of criminal misconduct or who it was worried would steal and sell its trade secrets.

35.     The defamatory statements defendant published were made by DJC at least negligently and without regard for the truth because it knew or should have known its statements to be false.  The Daily Journal could easily have checked the case it cited, the Southern District case, or even done a quick and simple word search and seen that the complaint never mentioned anything about theft or sale of trade secrets.   DJC used the articles to scare people and to benefit itself at Beres's and others's expense during the second worst pandemic in U.S. history.

36.     As a direct and proximate result of defendant's defamatory actions, Beres has suffered and continues to suffer damage, including, but not limited to, damage to his reputation, embarrassment, pain, humiliation, mental anguish, and has sustained past and future loss of earnings.

37.     At the time the false and damaging statements were published, defendant knew or should have known them to be false.  Defendant made its statements at least negligently, and nonetheless, made and/or published the statements with an intent to indulge ill will, hostility, and an intent to harm, thus giving rise to the right to recover punitive damages in order to deter defendant from engaging in this conduct in the future and hopefully restore integrity to both defendant and the media as a whole.

WHEREFORE, plaintiffs demand:

a)      Judgment against defendant in the amount of Twenty Million Dollars ($20,000,000) as compensatory damages.

b)      One Hundred Million Dollars ($100,000,000) as punitive damages.

c)      All taxable litigation costs, pre-judgment interest, and post-judgment interest.

d)      A trial by jury.


Dated:    January 18, 2022                        /s/Christopher T. Beres___
                                                  Christopher T. Beres, Esq.
                                                  *Attorney for Plaintiffs*
                                                  Florida Bar No.:  588261
                                                  16975 NE 35th Ave
                                                  North Miami Beach, FL 33160
                                                  (321) 339-9301
                                                  christopherberes8@gmail.com

<u>CERTIFICATE OF COMPLIANCE</u>

I HEREBY CERTIFY that plaintiffs have complied with the pre-suit notice requirement of

Fla. Stat. § 770.01.


Dated: January 18, 2022                    /s/Christopher T. Beres
                                           Christoper T. Beres, Esq.

Exhibit A

# Sheppard Mullin

## Insights

**ATTORNEYS**

Rebecca Edelson

**PRACTICE AREAS**

Trade Secrets

## Does COVID-19 threaten your trade secrets? (Yes, it does) (Part 1)

*Daily Journal*

04.28.2020



## Articles

# Does COVID-19 threaten your trade secrets? (Yes, it does) (Part 2)

*Daily Journal*
04.29.2020

## Attorneys

Rebecca Edelson

Seong Kim

Joseph C. Peacock

## Practice Areas

Trade Secrets

**DOES COVID-19 THREATEN YOUR  TRADE SECRETS?  YES, IT DOES. (Part I)**
By Rebecca Edelson (https://www.sheppardmullin.com/redelson) and Seong H. Kim
(https://www.sheppardmullin.com/shkim)

COVID-19 is wreaking havoc in a number of legal areas.  You don't hear a lot about trade secrets
being affected by the COVID-19 pandemic, but, make no mistake: trade secrets are very much
threatened by the COVID-19 outbreak.  In this two-part article, we address how trade secrets are
threatened and potential steps that may reduce the threat to trade secrets.

The COVID-19 pandemic threatens increased risks to trade secrets in at least two ways: (1)
increased layoffs of employees; and (2) work from home ("WFH") mandates.   The COVID-19
has caused millions of employees in the United States to be laid off and shifted a large percentage
of the workforce to WFH.  *See* News Release of Labor Statistics U.S. Department of Labor
USDL-20-0521 ("The number of unemployed persons rose by 1.4 million to 7.1 million in March.
The sharp increases in these measures reflect the effects of the coronavirus…");
https://www.statista.com/statistics/1110076/share-adults-work-situation-covid-19-us/ (as of early
April 2020, 20 percent of U.S. adults are working from home during the COVID-19 outbreak).
Part I of this article addresses the risks arising from the increased layoffs.  Part II addresses the risks
arising from the shift of the workforce to WFH.

Any time there is a termination of an employee, there is potential for misappropriation or loss of
trade secrets.  Consider the following potential scenarios:
- An employee disgruntled by the termination decides to exact revenge (e.g., by posting the
  employer's trade secrets on the Internet; by taking the only memorialization of the trade
  secret; by withholding from the employer a trade secret that the employee developed
  during the employment).  *See, e.g., Covenant Testing Technologies LLC v. Judge,* Case
  No. 2020-22716 (127th District Court of Harris County, Texas)(complaint alleges that the
  defendant took revenge for being fired by deleting data files minutes after she was notified
  of her termination).
- The former employer's competitor hires the employee in a position in which her
  knowledge of the former employer's trade secrets could benefit the competitor.
- A terminated employee cannot find new employment and decides to use the former
  employer's trade secrets as a source of income.  *See, e.g., HC2 Inc. v. Delaney,* Case No.
  1:20-cv-03178 (U.S. District Court for the Southern District of New York)(complaint
  alleges that a former employee of a legal staffing company tried to extort clients for
  $450,000 by threatening to release confidential information after they suspended a
  document review project due to the COVID-19 pandemic).

Because employers recently have laid off employees in droves in response to the COVID-19
pandemic, there is an increased risk to the employers' trade secrets.

Employers may be tempted not to follow the usual protocols for these COVID-19 layoffs because
the number of terminations and/or other demands from the pandemic crisis are overwhelming.
Every effort, however, should be made to follow the usual protocols with employees who have had
access to the employer's trade secrets.  A business' trade secrets can be among its most valuable

assets and the loss of trade secrets can undermine its competitive advantage.

The following are potential steps that employers may wish to consider to reduce the risk to trade secrets in connection with employee terminations:

- Do not permit any employees to maintain the only memorialization of a trade secret. Require employees to disclose to the company any inventions or other trade secrets that they develop for the company.  Before employees are given notice of their termination, check in with them about whether there are any inventions or trade secrets under development that they have not yet disclosed to the company.  If there are, ask them to make the disclosure at that time. The inquiry should be made in a casual manner so as not to arouse suspicions in the employee that a termination is forthcoming.
- Be vigilant in ensuring that terminated employees return all company property, including materials that contain the company's trade secrets or other confidential information. Expressly ask about what is at home, on personal email and iCloud accounts and on USB and hard drives.
- Remember to cut off terminated employees' access to company trade secrets (e.g., by disabling employee email accounts and passwords).
- Do not forego the exit interview; conduct it remotely if need be.  If handled skillfully, an exit interview can reveal that a terminated employee is a particular threat (e.g., during the interview, she repudiates her obligations to protect the employer's trade secrets; she threatens to misappropriate trade secrets or refuses to return confidential company documents; or she lies about her future employment plans).  Such statements by an employee can provide critical evidence in support of an application for an injunction against the employee or her new employer.
- Send a letter to the terminated employees, reminding them of their ongoing obligations to protect the confidentiality of the employer's trade secrets.
- Monitor for misappropriation (e.g., unusual downloads or emails to a personal email account; surprising advances by the new employer shortly after the former employee's employment commences).
- Upon perceived misappropriation or threatened misappropriation, take prompt action in consultation with counsel.
- Preserve all evidence that is potentially relevant to the future litigation against the employee (and, if applicable, the new employer).  Even if there is no perception of threatened misappropriation at the time of termination, consider preserving, for a period of time, the employee's computer and other devices in case there is misappropriation in the future.

This article is for informational purposes only and does not constitute legal advice and does not form an attorney client relationship.

***

**DOES COVID-19 THREATEN YOUR TRADE SECRETS?  YES, IT DOES. (Part II)**

By Rebecca Edelson (https://www.sheppardmullin.com/redelson) and Joseph Peacock (https://www.sheppardmullin.com/jpeacock)

In Part I of this article (published ___, 2020), we addressed (1) how employee layoffs caused by the COVID-19 pandemic have increased the risk to the employer's trade secrets; and (2) some potential measures employers can take to reduce that risk.  In Part II, we address how work from home ("WFH") mandates resulting from the pandemic also increase the risks to the employer's trade secrets and some potential measures that employers can take to reduce those risks.

The COVID-19 pandemic has shifted a large percentage of the workforce to WFH.  See https://www.statista.com/statistics/1110076/share-adults-work-situation-covid-19-us/ (as of early April 2020, 20 percent of U.S. adults are working from home during the COVID-19 outbreak). WFH threatens an employer's trade secrets on two fronts: (1) an increased opportunity for misappropriation; and (2) an increased risk that reasonable steps to protect the secrecy of the information are not taken, thereby jeopardizing the employer's ability to enforce information as a trade secret in the future. Consider the following potential scenarios:

- A WFH employee conducts video conference calls about trade secret information in ear shot of others in the house.
- A WFH employee uses the employer's trade secrets on a computer at home with no firewall, password or encryption protections in place.
- A WFH employee opens a malicious email which allows a third party to hack into the employer's network and access its trade secrets.

Because many employers have implemented WFH mandates in response to the COVID-19 pandemic, it is important for businesses to address the security of their trade secrets in the WFH environment.  Employees should be reminded that they are tasked with ensuring that the employer's trade secrets remain confidential while they WFH.

Consider whether any WFH policies that existed before the COVID-19 pandemic should be modified (e.g., a policy that no trade secrets may be taken home may be unworkable under the existing circumstances).

The following are potential steps for consideration to protect trade secrets in a WFH environment:

- Prohibit employees from transmitting or maintaining company confidential information except as authorized by the company, identify methods that are not authorized (e.g., personal email accounts, cloud accounts, social media, etc.).
- Ideally, employees should do their work involving trade secrets in a room to which only they have access.  If that is not possible, employees should keep a "clean desk" to prevent others in their homes from viewing company trade secrets.  They also should not have conference calls or video-chats about confidential information in the presence of others in their homes.   This is true even if they think those others do not present a realistic risk of misappropriation (e.g., a family member).  In addition to avoiding misappropriation, taking reasonable steps to protect secrecy is also imperative since, otherwise, the information may lose its trade secret status.
- Require that home assistant devices (such as Google Home and Alexa) be disabled when employees are on conference calls or video-chats about confidential information.

- Admonish employees not to discard confidential materials in their ordinary trash and instead retain those materials in secure (locked) locations at their homes so they may be securely disposed of once the employees return to the office.
- Mandate employees to connect to your business' network as securely as possible, such as through a VPN which uses a multi-step authentication for access.
- Remind employees to password-protect their home WiFi systems and to work with the employer's IT personnel so that communications including confidential information are encrypted. Consider implementing technology that prevents forwarding trade secret information to email accounts outside the employer's business.
- If possible, consider prohibiting your workers from transmitting trade secret information via email altogether.  Instead, permit access to trade secret information via secured shared drives with access rights limited to a need-to-access basis.
- Mandate that, with the assistance of your IT personnel, your WFH employees set their home computer screens to lock after a set time period (e.g., five minutes) of non-use and require passwords to unlock the screens.
- Educate employees about malicious emails, SMS messages, and other communications designed to infiltrate the employer's network.  Wrong-doers are taking advantage of the COVID-19 pandemic by sending emails and SMS messages regarding purported COVID-19 tips, maps, and other scare tactics to entice users to open malware.  Remind employees to open messages from only trusted sources and require employees to report suspicious messages to the employer's IT team.  Advise employees that, if they open malware or a virus or have been hacked, they should contact the employer's IT team immediately so that the employer can attempt damage control as soon as is possible.
- Develop a system to account for all confidential information maintained at WFH employees' homes and, if reasonably practical, create a check-out/check-in process for employees to return such confidential materials.
- If employees download, copy, print, or delete a significant amount of data from the employer's network, the employer's IT should alert management.  The activity may turn out to be legitimate, but it should be investigated.
- If reasonably practical, implement remote lock-out and wipe capabilities (e.g., the employer's IT department can lock an employee out of the employer's network if the employee is a perceived threat, and it can wipe all company data from a device if an employee misplaces a company device).
- If possible, issue laptops to employees that have anti-virus/malware applications installed and that do not have USB ports to prevent unauthorized thumb drive downloads.
- Give your employees a specific "go to" person at the company, should they have any questions or concerns about WFH with company confidential information.

The COVID-19 situation is in flux and there is no clear-cut authority or bright line rules about what are reasonable steps to protect trade secrets in response to the ramifications of the COVID-19 pandemic.  The above are simply proposed steps for consideration.

This article is for informational purposes only and does not constitute legal advice and does not form an attorney client relationship.

Exhibit B

**The Law Office of Christopher T. Beres**
**1600 Sarno Road, No. 1**
**Melbourne, FL 32935**
**Tel. (321) 339-9301**
christopherberes8@gmail.com

April 07, 2020

███████████████

**Toyota Motor Corporation**
**1 Toyota-Cho**
**Toyota City**
**Aichi Prefecture 471-8571**
**Japan**
██████████@toyota.co.jp

Dear Mr.████████████████████:

I represent Andrew Delaney against Toyota.

You used Mr. Delaney to be a ██████ language document reviewer to assist you with █████████████
██████████████████████████████████████████ starting on September 30, 2019.

On March 17, 2020, you had Mr. Delaney illegally fired for raising concerns about unlawful and unsafe conditions in your workplace.

Prior to this date, you illegally disclosed Mr. Delaney's identity, involvement, and work-product to the other side.

At first, you did not inform him about the subject matter of the case which was ████████████████
██████████████████████████████████

Toyota insisted on ████████████████████████████
█████████████████████

HC2-05000511

*For Toyota,* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *but you had no right to drag Mr. Delaney into this.*

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *You have destroyed Mr. Delaney's residence and business and placed his life in grave danger.*

*After Mr. Delaney was a whistleblower and complained about* ▮▮▮▮▮▮▮▮▮▮ *, you defamed him, made up lies about him, and threatened him.*

*I hereby grant you 7 days from the date of this letter to contact me with your offer to settle this case.*

*If you fail to contact me by this date, I will commence legal action against you without further notice.*

*Very truly yours,*

*Christopher T. Beres*

Christopher T. Beres

CONFIDENTIAL

Exhibit C



 Google

Does COVID-19 threaten your trade secrets? (Yes, it does)

🔍 All    🖼 Images    🛒 Shopping    📰 News    ▶ Videos    ⋮ More              Settings    Tools

About 7,440,000 results (0.78 seconds)

www.sheppardmullin.com › article-3217  ▾

**Does COVID-19 threaten your trade secrets? (Yes, it does ...**
**Does COVID-19 threaten your trade secrets?** (**Yes, it does**) (Part 2). Daily Journal. 04.29.2020.
Attorneys. Rebecca Edelson · Seong Kim · Joseph C. Peacock ...

www.sheppardmullin.com › article-3216  ▾

**Does COVID-19 threaten your trade secrets? (Yes, it does ...**
**Does COVID-19 threaten your trade secrets?** (**Yes, it does**) (Part 1). Daily Journal. 04.28.2020.
Attorneys. Rebecca Edelson · Seong Kim ...

m.facebook.com › DailyJournalCorp › photos  ▾

**Los Angeles / San Francisco Daily Journal - Does COVID-19 ...**
**Does COVID-19 threaten your trade secrets?** (**Yes, it does**) COVID-19 is wreaking havoc in a
number of legal areas. You don't hear a lot about trade...

m.facebook.com › DailyJournalCorp › photos  ▾

**Los Angeles / San Francisco Daily Journal - Does #COVID-19 ...**
Does **#COVID-19 threaten your trade secrets?** (**Yes, it does**) (part 2) This article will address
how work from home mandates resulting from the pandemic...

www.hklaw.com › labor-employment-and-benefits › tr...  ▾

**Trade Secrets and Restrictive Covenants | Practices | Holland ...**
Counsel That **Is** Tailored to **Your** Needs ... when former employees **threaten your trade secrets**
and customer goodwill, members of ... IP Considerations During **COVID**-19: IP Housekeeping ...
When Possessing a **Trade Secret is** Enough to Sue.
Missing: ~~(Yes,~~ | Must include: **(Yes,**

www.corporatecomplianceinsights.com › covid-19-trad...  ▾

**Navigating and Weathering the COVID-19 Storm with Your ...**
May 13, 2020 - The **COVID**-19 pandemic **has** changed everything and affected everyone. ...
Companies should clearly define what information **is** a **trade secret** and what actions ... an
employee's conduct and the more serious the **threat** to a company's **trade secrets** (or ... Often,
the answer to this question **is** a simple "**yes**.

www.mondaq.com › unitedstates › 6-steps-to-protect-y...  ▾

**6 Steps To Protect Your Trade Secrets During Covid-19 ...**
May 24, 2020 - Although employers may not think that the **COVID**-19 pandemic **is threatening**
their **trade secrets**, it **is**.

www.seyfarth.com › covid-19-resource-center  ▾

**COVID-19 Resource Center | Seyfarth Shaw LLP**
As shelter-in-place orders are lifted, **your** business **will** enter uncharted territory. ... This resource
center **is** sponsored by our **COVID**-19 Task Force, ... Normalizing the Abnormal—Protecting **Trade**
**Secrets** in a Post-**COVID**-19 World ... Action Risks As The **COVID**-19 Pandemic Gives Way To
**Threatened** Tsunami Of Litigation.

www.fbi.gov › news › speeches › the-threat-posed-by-t...  ▾

**The Threat Posed by the Chinese Government and the ...**
Jul 7, 2020 - This **threat is** so significant that the attorney general and secretary of state **will** also
... companies, and academic institutions conducting essential **COVID**-19 research. ... $1 billion—
that's with a "b"—worth of **trade secrets** from **his** former employer, ... **Yes**, this **is** happening at
both the federal and state levels.

 Google

Does COVID-19 threaten your trade secrets? (Yes, it does)    ✕   🎤   🔍

Jul 6, 2020 - In light of the **COVID**-19 outbreak, companies have changed their core ... Here are five ways the pandemic and its effects could **threaten** trade secret protection. ... it may be prudent to inventory **your COVID**-19 development activities to ... One key component to protecting **trade secrets is** information security.

www.calpeculiarities.com › 2016/08/03 › about-that-tra...   ▼

### About That Trade Secret Leak: It's From Inside The Business ...

Aug 3, 2016 - Seyfarth Synopsis: Protecting **trade secrets** from employee theft requires more than using an NDA when onboarding employees. ... (**Yes**, you need to **do** exit interviews!) ... not outsiders, pose the greatest **threat** of loss from **trade secret** theft. ... Remember, **your** organization **will** not even have **trade secrets** to ...

twitter.com › ladailyjournal › status

### LA Daily Journal on Twitter: "Does COVID-19 threaten your ...

Apr 28, 2020 - Does COVID-19 **threaten your trade secrets**? (**Yes, it does**) #COVID-19 is wreaking havoc in a number of legal areas. Full column by Rebecca ...

www.dailycommerce.news › ...   ▼

### Daily Commerce

Published since 1917, the Daily Commerce **is** based in Los Angeles and covers news of general interest, columns of ... FCC designates Huawei as national security **threat** ... Does **COVID**-19 threated **your trade secrets**? (**Yes, it does**) (part 2).

www.shutts.com › ippipeline › tag › trade-secrets   ▼

### Trade Secrets - Shutts & Bowen LLP

Does **COVID**19 Warrant A 90-Day Extension Of a Case Pending More Than A Year? ... **Do** You Need To **Threaten** Litigation To Trigger Declaratory Judgment ... **Yes**. Thursday, LLC and Ki̇hip, Inc. are both retailers that use Amazon to sell nail clippers online. ... **Trade Secrets** as Part of **Your** IP Portfolio: The Case of Col.

www.mintz.com › insights-center › viewpoints › 2020-...   ▼

### Steps Your Company Should Consider Now to Protect Value ...

Apr 17, 2020 - The coronavirus pandemic **has** created profound changes to how many ... in many states, **has** created a marked increase to the **threat** of **trade secret** misappropriation. ... of **Trade Secret** Litigation on the Horizon Due to **COVID**-19 Pandemic, ... A **trade secret can** be any type of valuable confidential business ...

Missing: ~~(Yes,~~ | Must include: (**Yes,**

www.pollardllc.com › coronavirus-frivolous-non-comp...   ▼

### Covid-19 & a Tsunami of Frivolous Non-Compete & Trade ...

Jun 22, 2020 - **Covid**-19 **Has** Resulted in a Tsunami of Frivolous Non-Compete ... This is a paradigmatic misappropriation of **trade secrets** case. ... to engage in unfair competition; and (4) that misuse **threatens** imminent and ... **Yes**, it makes a significant difference in litigation. ... **His** office **can** be reached at 954-332-2380.

www.dhs.gov › news › 2020/09/09 › 2020-state-homel...   ▼

### 2020 State of the Homeland | Homeland Security

Sep 9, 2020 - The Department of Homeland Security **is** bound by one mission, one creed. ... To the Department's leadership here today: **your** job **is** not easy. ... Of all the **threats** DHS **has** confronted in the last year, the **COVID**-19 pandemic **has** ... From intellectual property theft and stealing **trade secrets** that rob from ...

www.iptechblog.com › 2016/04 › europe-yes-vote-for-tra...   ▼

### Europe – 'Yes' vote for Trade Secrets Directive | Global IP ...

By way of follow up to our January blog post, we **can** now report that, at the end of last week, the ... This **was** despite some concern that the Directive could **threaten** press freedom, ... In essence, the Directive seeks to harmonise **trade secrets** law across the EU. ... Visit our Coronavirus (**COVID**-19) Legal Insights Hub ...



Does COVID-19 threaten your trade secrets? (Yes, it does)    ✕  🎤  🔍

In response to requests, the FOIA **does** not require agencies to create records, ... Exemption (b)
(4) **trade secrets** and commercial or financial information ... Please be aware that due to **COVID-
19**, SBA's response time to certain FOIA ... We apologize for any inconvenience and appreciate
**your** patience during this time.

www.dickinson-wright.com › news-alerts › maintaining... ▾
**Maintaining Trade Secrets Amid the COVID-19 Pandemic ...**
Apr 11, 2020 - Crises like **COVID-19 can** make or break a company's intellectual property assets.
... **Trade secret** protection **is** a counterpart to patent protection. ... vigilance to ensure the
secrecy of **your** new process, method, or formula. ... up to speed on increased cybersecurity
**threats** that seek sensitive information under ...
Missing: (Yes, | Must include: (Yes,

www.nextgov.com › cybersecurity › 2020/07 › two-chi... ▾
**Two Chinese Nationals Indicted for Stealing Trade Secrets ...**
Jul 21, 2020 - "China **has** now taken its place, alongside Russia, Iran and North Korea, ... Russian
hackers are attempting to steal **COVID-19** research. ... Get the latest federal technology news
delivered to **your** inbox. ... In a speech last Thursday, Attorney General William Barr warned China
**will do** anything to win the ...

www.justice.gov › ... › Office of Public Affairs ▾
**INFORMATION ABOUT THE DEPARTMENT OF JUSTICE'S ...**
In addition to identifying and prosecuting those engaged in **trade secret** theft, hacking, and ...
The China Initiative **is** led by the Department's National Security Division (NSD), which **is**
responsible for countering nation-state **threats** to the United States. ... and Confidential Business
Information, Including **COVID-19** Research.

us.norton.com › internetsecurity-emerging-threats-retur... ▾
**Reopening, work, and COVID-19: 6 tips to help stay secure ...**
As U.S. businesses start to reopen, employees and employer **can** team up to help keep ... The
answer: You and **your** employer need to team up on device security. ... a serious **threat** to
companies, something that **COVID-19** hasn't changed. ... and malware to steal **trade secrets**,
personnel information, or company financials.

www.fisherphillips.com › post-pandemic-faqs ▾
**FP BEYOND THE CURVE: Post-Pandemic FAQs For Employers**
Sep 3, 2020 - **Yes**, a key aspect of keeping **your** employees safe **is** to ensure that all ... Can an
employee who **is** directly exposed to **COVID-19** return to work before ... Act." OSHA describes
imminent danger as where there **is** "**threat** of death or ... **TRADE SECRETS**, NON-COMPETITION,
AND DUTY OF LOYALTY ISSUES.

www.bbc.com › news › world-us-canada-53493028 ▾
**US charges Chinese Covid-19 research 'cyber-spies' - BBC ...**
Jul 21, 2020 - **Yes**, I agree **Yes**, I agree ... US charges Chinese **Covid-19** research 'cyber-spies' ...
Jiazhi released on Tuesday include charges of **trade secret** theft and wire fraud conspiracy. ...
FBI director: China **is** 'greatest **threat**' to US ... Theresa **is** one of the first women from **her**
community of tea pickers in Sri Lanka.

www.technologyreview.com › 2020/08/19 › china-cor... ▾
**The FBI's decades-long fight against industrial espionage ...**
In the global economy, companies that steal **trade secrets** rarely face the consequences. by ...
August 19, 2020 ... **His** trip to Johnston, a Des Moines suburb, **was** not intended to be ... to
combat economic espionage and tackle cybersecurity **threats**. ... The Justice Department **is**
waging war on Chinese industrial espionage.

4discovery.com › 2012/11/06 › do-employees-steal-tra... ▾
**Do Employees Steal Trade Secrets? Yes! (Just Ask Them ...**

 Does COVID-19 threaten your trade secrets? (Yes, it does)  

www.ndlaw.com › blog › does-your-company-have-tra...

**Does your company have trade secrets? - Ebeltoft . Sickler . Lawyers**

In North Dakota, and in many states, a **trade secret is** information, including a ... Most lawyers write a **threatening** letter to the former employee demanding that ...

www.mrllp.com › alert-employer-dos-and-donts-in-the-...

**Employer Do's and Don'ts in the Age of COVID-19: Michelman ...**

Apr 1, 2020 - In the wake of the coronavirus pandemic, many employers are left uncertain as to ... acknowledged the community spread of **COVID-19** is a direct **threat**, and have ... A. Yes, you **can** require that **your** employees wear PPE during the pandemic. ... Maintaining **Your Trade Secrets** During the Coronavirus Crisis ...

www.boyarmiller.com › legal-alerts › can-you-keep-a-s...

**Can You Keep a Secret? Texas Legislature Says Yes ...**

Aug 13, 2013 - The new statute **can** be found in Texas Civil Practice & Remedies Code ... of what a **trade secret is**, with TUTSA there **is** now a uniform definition for courts to apply. ... While "actual or **threatened**" misappropriation may be enjoined, upon ... This website uses cookies to improve **your** experience while you ...

enigmaforensics.com › blog › r-mark-halligan-esq-on-...

**Internal Trade Secret Management Defend Trade Secret Act of ...**

Dec 6, 2019 - **COVID-19** Downloadable Statistics · Alabama Coronavirus ... Mark Halligan: Well, the **Defend Trade Secrets** Act of 2016 is a ... actual misappropriation or **threatened** misappropriation of **trade secrets**, you ... Mark Halligan: **Yes**, yes, absolutely. ... What **do** you prepare, have the data prepared for **your** TRO?

www.americanbar.org › litigation › committees › practice ▾

**Tips for Handling Non-Compete Agreements During Times of ...**

Apr 30, 2020 - Since the economy began its nosedive as a result of the **COVID-19** pandemic, tens of ... The answer to whether an employer **can** enforce non-compete agreements ... serious **threat** to a company's **trade secrets**, goodwill, or customer relationships, the ... Having **Your** Arbitration Clause and Waiving It, Too ...

www.csis.org › blogs › strategic-technologies-blog › no... ▾

**Not April Fools, hacker friends | Center for Strategic and ...**

Apr 1, 2015 - Knowingly receive or use **trade secrets** that were stolen by cyber-enabled means for ... the underlying theft of the **trade secrets is** reasonably likely to result in, or **has** materially contributed to, a significant **threat** to the national security, ... Notes from a CSIS Virtual Event: Countering **Covid-19** Related Fraud.

www.latimes.com › business › story › loreal-owes-olapl... ▾

**L'Oreal owes Olaplex $91 million for stealing trade secrets ...**

Aug 12, 2019 - L'Oreal owes Olaplex $91 million for stealing **trade secrets** ... of **his** rebuttal to L' Oreal SA's closing argument in a **trade-secrets** trial, ... Since a party **can't** recover money for the same wrong more than once, ... In the end, the answer to all three **was yes**. ... **COVID-19** pandemic **has** cut into side jobs too.

today.law.harvard.edu › roundup › uncharted-territory-... ▾

**Uncharted territory: Legal experts weigh in on the COVID-19 ...**

**Your** internet **is** terrible during **COVID-19** pandemic. ... any rogue scientist or college-age biohacker **can** use them, creating an even greater **threat**. ... **can** and cannot **do** on **his** own, without Congress: No to new money; **yes** to relaxed collection ... Nevertheless, since the pandemic began, **trade** unions have taken on renewed ...

www.ipwatchdog.com › 2020/03/26 › homework-keep... ▾

**Do Your 'Home Work': Keeping Trade Secrets Safe While ...**

 Google

Does COVID-19 threaten your trade secrets? (Yes, it does)    ✕   🎤   🔍

threatening measures to protect secrets, but the process **was** fairly ... **Yes**, it makes it really, really certain that it **is** you when you have to wait ...

www.mintz.com › insights-center › trade-secrets ▾

### Trade Secrets | Mintz - Mintz Levin

Companies **can** minimize **trade secret** theft by business partners by instituting ... Workplace Confidential: Preventing Former Employees from Using **Your Trade Secrets** ... The "Perfect Storm": **COVID-19** and **Trade Secret** Litigation ... in many states, **has** created a marked increase to the **threat** of **trade secret** misappropriation.
Missing: (Yes, | Must include: (Yes,

ogletree.com › insights › five-questions-you-should-ask... ▾

### Five Questions You Should Ask About the Defend Trade ...

Jun 21, 2016 - **COVID-19** Resources · People · Locations · Insights/Podcasts ... The DTSA **does** not require prediscovery **trade secret** identification. ... the "**threatened** misappropriation" language of the UTSA (for those states ... The short answer is "**yes**. ... (1) the individual may disclose the **trade secret** to **his** or her attorney, ...

www.floridatrend.com › article › layered-approach-pro... ▾

### Layered Approach Protects Trade Secrets | Sponsored Report ...

Mar 28, 2019 - **Trade secrets can** include company financial records; pricing ... from **threats** — including those that may walk in **your** door every day. Paul O.

www.jdsupra.com › legalnews › how-safe-is-that-harbo... ▾

### How Safe Is That Harbor? The Impact of the Defend Trade ...

Sep 13, 2019 - Imagine that **your** company **has** just commenced an internal ... **Is** the employee in fact immunized from liability for **his** acquisition and disclosure of **your trade secrets**? One might assume **yes** based on the DTSA's whistleblower immunity ... injunction) that prevents any actual or **threatened** misappropriation, ...

www.pearsonassessments.com › footer › legal-policies ▾

### Legal Policies - Pearson Assessments

Jan 18, 2018 - Furthermore, disclosure of the assessments may **threaten** the ongoing ... **It is** the position of Pearson that any reproduction of its test or other ... If you are in California, please check with an attorney regarding **your** responsibilities. ... Rule **is** subject to Section 1172(e) of HIPAA, 'protection of **trade secrets**'.

www.ctvnews.ca › world › u-s-accuses-chinese-hackers-in... ▾

### U.S. accuses Chinese hackers in targeting of COVID-19 research ...

On Thursday, three provinces released new details on how they plan to curb the **threat** of **COVID-19**. ... 'Success is fragile': Top doctor warns of 'backslide' as **COVID-19** cases rise ... Newsletter sign-up: Get The **COVID-19** Brief sent to **your** inbox ... Chinese government efforts to use hacking to steal **trade secrets** for Beijing's ...

www.nytimes.com › equifax-breach-china-hacking

### Opinion | Chinese Hacking Is Alarming. So Are Data Brokers ...

Feb 10, 2020 - Companies like Equifax **threaten** our personal privacy and our national security. ... intelligence to steal **trade secrets** and personal information to target Americans. ... **Yes**, one **is** corporate and legal and the other geopolitical and ... If you're online — and, well, you are — someone's using **your** information.

www.kuaf.com › post › bomb-presents-secret-history-n... ▾

### 'The Bomb' Presents A 'Secret History' Of Nuclear War ... - KUAF

2 days ago - In 2017, when President Trump **threatened** to rain fire and fury on ... **His** latest **is** " The Bomb: Presents, Generals, And The **Secret** ... Maybe we should **trade** the missiles that we have in Turkey for **his** ... And that **was** when Reagan and Gorbachev kind of spontaneously came to the conclusion that, **yes**, let's ...

 Google

Does COVID-19 threaten your trade secrets? (Yes, it does)

The United States Patent and Trademark Office refers to a **trade secret** as a type of intellectual property. This definition of **trade secrets is** in reference to the ...

Missing: (Yes; | Must include: (Yes,

www.factcheck.org › 2020/09 › bidens-early-statement... ▾

### Biden's Early Statements About the Coronavirus - FactCheck.org

Sep 21, 2020 - The "**coronavirus is** a serious public health challenge," Biden said at a Feb. ... While some of **his** comments about the potential danger of the virus have proved ... that on March 19, Trump told Woodward that he had understated the **threat** of ... strong mitigation, the president's response **was**, "**Yes**, we'll **do** it.".

www.skoler-abbott.com › 2020/09/29 › healthcare-org... ▾

### Health Care Organizations Must Provide FFCRA to Some ...

21 hours ago - The DOL **has** substantially narrowed the categories of employees who ... you now have to provide some of **your** employees with FFCRA leave, ... According to the amended regulations, the answers to all of those questions may now be "**yes**." ... When the employee **has COVID-19** or **has** been tested and **is** ...

www.burnslakelakesdistrictnews.com › news › amp ▾

### Can U.S. border guards search your phone? Yes, and here's how ...

Secretary Kirstjen Nielsen explained some of what the new policy **does** and doesn't **do**. ... must be handled in accordance with U.S. law, like privacy and **trade-secrets** legislation. ... device returned — unless there's a security **threat** and probable cause for an exception ... B.C. records 236 new **COVID-19** cases over weekend.

www.conchovalleyhomepage.com › national-news › ap... ▾

### AP Interview: US ambassador defends tough approach to China

1 day ago - Branstad **is** returning to Iowa this weekend after three years and ... its handling of **COVID-19** to its military moves in the South China Sea ... Branstad, who traveled widely in China during **his** stint, complained ... On trade, China promised to strengthen protection of foreign technology rights and **trade secrets**.

www.reuters.com › news ▾

### U.S. News | Reuters

Reuters.com **is your** online source for the latest U.S. news stories from coast to coast ... 1:19am EDT ... at start of first Trump-Biden presidential debate in age of **coronavirus** ... U.S. intelligence reports warn of extremist **threat** around election.

1   2   3   4    Next

Camelback East Village, Phoenix, AZ - From your Internet address - Use precise location - Learn more

Help    Send feedback    Privacy    Terms